ALLEN v. CURRIER LUMBER COMPANY.

1. VENDOR AND PURCHASER—DEEDS—PERFORMANCE OF COVENANTS.
   The conveyance by a warranty deed satisfies the obligation of a
   land contract to convey by warranty deed but covenant in
   the contract that the house on the premises would be con-
   structed to the satisfaction of Federal Housing Administration
   and in conformance with local and State building codes or re-
   quirements was not merged with the deed covenants when the
   warranty deed was executed, the deeds not being in full per-
   formance of the agreement of the parties.

2. DEEDS—UNPERFORMED COVENANTS OF LAND CONTRACT—MERGER.
   Unperformed provisions of a preliminary land contract are not
   merged in deed given in part performance of the contract
   but remain in force until full performance.

3. VENDOR AND PURCHASER—LAND CONTRACTS—DEFECTIVE CONSTRUC-
   TION—EVIDENCE.
   Testimony of plaintiff purchasers of homes on land contracts
   and their experienced cement contractor and painter as to
   cause of defective cement and paint on houses purchased from
   defendant held, competent to show houses had not been con-
   structed in accordance with the terms of the contract nor in
   a workmanlike manner.

4. APPEAL AND ERROR—NONJURY CASE—FINDINGS OF FACT—EVI-
   DENCE—DEFECTIVE BUILDING CONSTRUCTION.
   Trial court's finding in nonjury case that plaintiffs were en-
   titled to judgments for repairs that they had made to their
   homes which they had purchased from defendant on land
   contracts held, not against the clear preponderance of the
   evidence, where both parties presented expert testimony as

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 55 Am Jur, Vendor and Purchaser § 327 et seq.
[1, 2] Deed as superseding, or merging, provisions of antecedent
       contract imposing obligations upon the vendor.   84 ALR 1008.
[3] 9 Am Jur, Building and Construction Contracts § 139.
[4] 9 Am Jur, Building and Construction Contracts § 152.
[5, 6] 3 Am Jur, Appeal and Error § 896 et seq.

to cause of defects in painting and cement work and defendant's witnesses appeared not to have testified with complete assurance.

5. SAME—QUESTION FOR TRIER OF THE FACTS.

The Supreme Court is not inclined to substitute its conclusion as to a question of fact for that of the trier of the facts, where the facts are in such dispute that reasonable minds might differ on the result.

6. SAME—NONJURY LAW CASE—CREDIBILITY OF WITNESSES—PREPONDERANCE OF EVIDENCE.

The trial court is the judge of the credibility of the witnesses in a nonjury action at law and the Supreme Court examines the record to ascertain whether the findings are against the preponderance of the evidence.

Appeal from Wayne; Moynihan (Joseph A.), J. Submitted October 14, 1953. (Docket No. 29, Calendar No. 45,916.) Decided November 27, 1953.

Separate actions by Arthur L. Allen and 17 others against Currier Lumber Company for damages resulting from defective construction of houses. Cases consolidated for trial and appeal. Judgments for plaintiffs. Defendant appeals. Affirmed.

*Robert F. Robbins (Joseph J. Geraci,* of counsel), for plaintiffs.

*Fildew, DeGree & Fleming,* for defendant.

ADAMS, J. This is an appeal from 18 separate judgments entered for the several plaintiffs in the Wayne circuit court. The cases are similar in nature and subject matter and were consolidated for trial in the lower court and here on appeal.

The defendant, Currier Lumber Company, in conjunction with 2 subsidiary corporations, built some 250 homes in Ferndale, Michigan, during the latter part of 1941 and in 1942. All the houses had 5 fin-

ished rooms with exterior dimensions of 30 feet by 24 feet and were sold at prices ranging from $4,250 to $4,750.

The plaintiffs individually purchased 18 of the homes from defendant prior to completion. Contracts were identical except as to description of property and terms and read, in part, as follows:

"The seller hereby agrees to sell a completed residence * * * according to the following terms:

"The seller is to have said property entirely completed and available for occupancy within ———— days * * * All construction to have been completed to the satisfaction of the Federal Housing Administration and in conformity with the local and State building code or requirements. The seller finally agrees to deliver a satisfactory warranty deed to the property."

During the course of construction, each of the homes was inspected by an inspector of the city of Ferndale and by representatives of the Federal Housing Administration. It does not clearly appear from the record that the required 3 inspections were had by the city and the FHA, but it does appear that each house received a final approval from both. When the houses were completed, each plaintiff received a warranty deed from the defendant and gave a mortgage for the unpaid balance of the purchase price.

All the plaintiffs occupied their homes in 1942 with some of them going into possession before their homes were completely finished. Shortly after they took possession, plaintiffs became aware of imperfections and defects in the construction of the homes. In the case of some plaintiffs, the defects were noted within 6 weeks; some were not discovered for as much as a year later. Complaints on all the houses followed a similar pattern. Exterior paint blistered and peeled, interior wall paint washed away, base-

ment sidewalls cracked and leaked, basement floors cracked and in some cases partially disintegrated. Several of the plaintiffs complained to the defendant and in some cases an effort was made to correct the situation. In other cases, plaintiffs repaired both the exterior and interior of their homes. Some added new siding. Most of the plaintiffs found it necessary to repair basement walls and floors. Some tried to prevent leakage through weatherproofing and others resurfaced their basement floors.

Eventually the 18 plaintiffs started 18 separate suits to recover damages for repairs to their homes, alleging in their separate declarations that the defendant had failed in carrying out representations made to each of the plaintiffs that "said home had been built in good, workmanlike manner and according to the requirements of the Federal Housing Administration." In its answer, defendant denied that the alleged defects existed and added that if such defects did exist, the complaints were not seasonably made since each of the homes had been inspected and approved by representatives of the FHA.

Some 14 days were required for the trial of the cases. Each of the plaintiffs testified in relation to the condition of their homes, and persons experienced in the building trades gave their opinions as to the cause of the defects. During the course of the trial it was brought out that despite the fact that the specifications submitted to the Federal Housing Administration described the soil in the construction area as sand, it was actually a heavy clay with a high moisture content.

There are no storm sewers in the area and a sanitary sewer served to carry away both surface water and waste water from the homes. As a result, the drainage of the area was inadequate and on more than one occasion, but particularly in 1946, a number of the basements were flooded. Defendant produced

expert witnesses who testified that in their opinion all the troubles encountered by plaintiffs resulted from the high moisture content of the soil, inadequate drainage and resultant hydrostatic pressure.

At the conclusion of the trial the court found the plaintiffs had sustained their burden of proof and were entitled to judgments for the cost of repairing their homes. Judgments were entered accordingly.

On appeal, defendant claims, first, that when defendant conveyed the homes to the plaintiffs by warranty deed, the obligations of the original agreement were merged in the deed covenants and that the only covenants remaining thereafter were the warranties of freedom from encumbrance and of quiet and peaceful possession; second, that the plaintiffs produced no competent evidence to support the trial court's judgment that the houses had not been constructed with good workmanship and in compliance with FHA requirements and, third, that the trial judge had disregarded the clear and undisputed testimony of unimpeached witnesses that the only cause of plaintiffs' damage was inadequate drainage, moisture saturated soil and hydrostatic pressure.

The contract executed between each individual plaintiff and the defendant created several obligations, one of them requiring the defendant to convey the premises to plaintiff by warranty deed and another to complete the building to the satisfaction of the Federal Housing Administration and in conformance with local and State building codes or requirements. A subsequent conveyance by warranty deed satisfied the first of those obligations but not the second, and it is the second of those covenants upon which plaintiffs base their cause of action.

We are of the opinion that the second covenant was not merged with the deed covenants when the warranty deeds were executed and delivered. The

deeds were not in full performance of the agreement between the parties.

"As to plaintiff's claim of merger, it may be conceded that a deed made in full execution of a contract for the sale of land is presumed to merge the provisions of a preceding contract pursuant to which it is made, including all prior negotiations and agreements leading up to execution of the deed, with the long-recognized exception that—

"'Where, however, the deed constitutes only a part performance of the preceding contract, other distinct and unperformed provisions of the contract are not merged in it. And where a contract of sale provides for the performance of acts other than the conveyance, it remains in force as to such other acts until full performance.' 18 CJ, p 271." *Goodspeed* v. *Nichols,* 231 Mich 308.

But defendant says that in any event plaintiffs produced no competent evidence to support their position that the houses had not been constructed in a good and workmanlike manner and that FHA requirements had not been followed.

Each of the plaintiffs testified as to the appearance and condition of their homes in 1942 and 1943. As previously stated, that testimony discloses that within a relatively short time after each home was occupied, exterior paint blistered and peeled, interior paint rubbed off, basement walls cracked and leaked, basement floors cracked, crumbled and leaked. Some of the plaintiffs said that they had examined the waterproofing on the exterior of the basement walls and found a thin coating of tar preparation.

Testimony of the several plaintiffs was followed by the testimony of a cement contractor with 42 years' experience in that business. He said that he had examined the houses and that in his opinion the defects in the basement floors and walls were caused by an improper mixture of cement, sand and gravel;

by laying the basement floors in 2 layers; by failing to lay a uniform 4-inch thickness of cement on floors, and by failing to adequately waterproof the exterior of the basements. He stated that in his opinion the basements were not built in a workmanlike manner.

Plaintiffs also produced a witness who had had 30 years' experience as a painter. He testified that in his opinion the blistering and peeling of the exterior paint was caused by painting on wet siding. He further testified that in his opinion the interior paint, that plaintiffs said rubbed off easily, had a casein or buttermilk base and was not of good quality.

Another witness for plaintiffs who had been in the painting and decorating business for 30 years confirmed the opinion of the first painter and stated that it was his opinion that the original paint on the plaintiffs' homes was not applied in a good and workmanlike manner.

Federal Housing Administration minimum constructional requirements provide that wall paints shall have an oil or varnish base, that all lumber shall be dry and well-seasoned, that basement floors shall be 4 inches in thickness, that the concrete mix shall have certain minimum requirements of cement, sand and gravel, and that in areas "where other than sandy soil occurs: a coat of not less than 1/2-inch thick waterproof portland cement plaster shall extend from 2 inches above finished grade down to a cove at the bottom, extending to the outside edge of the footing."

We are of the opinion that testimony offered by the plaintiffs was competent to show that the houses were not constructed in accordance with the requirements of the FHA nor in a workmanlike manner.

It is the further claim of the defendant that the trial court disregarded the clear and undisputed testimony of defendant's unimpeached witnesses who

said that the only cause of the damage to plaintiffs' homes was inadequate drainage, soil saturation and hydrostatic pressure.

Defendant produced as witnesses several persons who were experienced in home construction and others who through experience and training were familiar with the engineering problems involved in protecting buildings from excessive moisture. Certain of those witnesses said that in their opinion the blistering and peeling of the exterior paint was caused by the excessive moisture in the soil which existed because of inadequate municipal drainage. Other witnesses for defendant said that in their opinion cracks and other defects in the basement floors and walls were caused by hydrostatic pressure and excessive moisture in the soil.

While defendant's witnesses were qualified to give their opinions as to the cause of damage to plaintiffs' homes, nevertheless it appears from the record that they did not testify with complete assurance. For example, the building inspector for the city of Ferndale, an engineer with college education, in giving his opinion of the effect of flooding on basement walls and floors said:

"*A.* It could have an effect and it could have no effect, depending upon the condition. If the water came through the sewer pipe and flooded the basement, it would have no effect on the basement floor; if, however, the water condition was such that the water came so fast from the outside and came up through, it would have an effect of—it could even break the concrete floor."

And again:

"*Q.* Where there is a new home built in Ferndale in 1941 or 1942 and the people move in in 1942 and there is no flooding in the basement and cracks ap-

pear in the basement floor, would that, in your opinion, be due to hydrostatic pressure?

"*A.* No, sir, it would be due to anything. Cracks will appear for many reasons.

"*Q.* But hydrostatic pressure under those facts would not be one of the reasons?

"*A.* I did not say that.

"*Q.* There has been testimony in this record that these people moved into their homes in Ferndale in 1942 and they have sworn that the cracks appeared in their basement floor not having had any flooding in their basement through the drains, before; now in your opinion would these cracks have any causal relation to hydrostatic pressure?

"*A.* No.

"*Q.* The cement floor as you stated may crack for a variety of reasons?

"*A.* Right.

"*Q.* The insufficient mix would be one?

"*A.* Yes.

"*Q.* If the bottom layer was laid before the top layer was put on, can cracks appear from the normal expansion and contraction of the cement layer?

"*A.* It could be presumed that way. It could, cracks could appear in fast drying, for fast drying for a number of other reasons."

Another witness for defendant who had had long experience in home construction testified:

"*Q.* Therefore, if the testimony in this case showed these people moved in in 1942, didn't have any flash floods for 2 years and the cracks did appear in there, in their basement after they moved in and before the 2-year period, then the cracks would not be due to any water pressure; isn't that a correct deduction of your theory?

"*A.* It could be.  *  *  *

"*Q.* Now, it has been testified here by all the home owners that within a year they attempted to clean the interior of their homes by washing every wall with a wet rag, and in so doing the paint came off on

the wet rag and even stained the water in the buckets that they were using. Now, in your opinion is that or is it not a good workmanlike job?

"*A.* It is not necessarily—

"*Mr. Robbins:* Yes or no to that question, if you please.

"*A.* Mr. Robbins, on that question, without elaborating, it is on the face, it is very difficult question to answer without—and still be honest about it."

Previous to defendant's proofs, plaintiffs had produced 3 witnesses, one a cement contractor with 42 years' experience who said in his opinion that the cement work was defective. Two other plaintiffs' witnesses with years of experience in painting testified that the defects in the exterior paint jobs were, in their opinion, due to the painting on wet siding and that the interior paint used was not up to FHA minimum requirements.

We are of the opinion that plaintiffs' testimony as to the condition of the houses and plaintiffs' witnesses' testimony as to the cause of the defects was competent. We are likewise of the opinion that defendant's witnesses were qualified to give competent opinion testimony as to the cause of the defects. Under such circumstances, the trial judge, hearing the case without a jury, was required to consider and weigh all the testimony and then make a finding of fact as a basis for a judgment. In such cases we do not reverse the trial judge unless his finding is against the clear preponderance of the evidence. From a full examination of the record we do not find that the trial court's finding was of such nature.

"We cannot say that this finding is against the preponderance of the evidence. There is testimony to support either claim and the determination of the issue depends upon which testimony to believe. We are not ordinarily inclined to substitute our conclusion for that of the trier of the facts where the facts

are in such dispute that reasonable minds might differ on the result. *Buhler* v. *City of Detroit,* 274 Mich 139. In law cases tried without jury, the trial court is the judge of the credibility of the witnesses. *Toussaint* v. *Conta,* 292 Mich 366. We examine the record to ascertain whether the findings are against the preponderance of the evidence. *Knaggs* v. *Lewis,* 287 Mich 431. In the case at bar, the finding is not against the preponderance of the evidence and it will not be disturbed by this Court." *Flat Hots Company, Inc.,* v. *Peschke Packing Co.,* 301 Mich 331, 336.

Judgments affirmed, costs of this appeal to plaintiffs.

DETHMERS, C. J., and BUTZEL, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.